## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

RHONDA CURTIS
605 Macdill Road
Middle River, Maryland 21220,

CLIFTON HARRIS
110 West Oak Terrace
Lockport, Illinois 60441,

and

KEITH YEARMAN
628 Willow Wood Drive
Carol Stream, Illinois 60188

each individually and on behalf of all others
similarly situated,

                Plaintiffs,

    v.

GEICO CASUALTY COMPANY
5260 Western Avenue
Chevy Chase, Maryland 20815,

and

GOVERNMENT EMPLOYEES
INSURANCE COMPANY
5260 Western Avenue
Chevy Chase, Maryland 20815,

                Defendants.

Case No. _____

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs, Rhonda Curtis, Clifton Harris, and Keith Yearman ("Plaintiffs"), each individually and on behalf of all others similarly situated, bring this class action against Geico Casualty Company ("Geico Casualty") and Government Employees Insurance Company

("Government Employees") (collectively, "Geico" or "Defendants") and in support thereof state the following:

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action to recover for (and put an end to) Geico's systematic underpayment of total loss first-party auto insurance claims in Maryland and Illinois. As set forth in detail below, Geico has a routine policy and practice of underpaying insureds for total loss claims in violation of its policies and binding Maryland and Illinois law.

2.      Plaintiffs were named insureds under Geico automobile insurance policies (the "Geico Policy" or the "Policy"), which provide coverage for automobile damage. Geico's Comprehensive and Collision coverages both allow for Geico to limit its liability to an insured vehicle's actual cash value ("ACV") in the event of total loss. During the class period, Geico used materially identical standard policy forms for all insureds (and class members) in Maryland and Illinois.

3.      Under Maryland and Illinois law and the terms of the Policy, Geico is obligated to base any total loss cash settlement, including an ACV cash settlement, on the retail cash value of the insured vehicle.

4.      Despite this obligation, Geico refuses to pay the retail value of comparable vehicles in determining the ACV of an insured vehicle.

5.      Geico uses the retail value of comparable vehicles in initially determining the ACV of an insured vehicle.

6.      Geico, however, applies an improper "condition adjustment" deduction to the retail cost of these comparable vehicles to reduce from retail value to private party value, which violates

Maryland and Illinois law and the insurance Policy, necessarily resulting in an underpayment when it pays ACV cash settlements.

7.     By applying this wrongful "condition adjustment," Geico has breached its duty to pay what it owes on insured total losses, damaging Plaintiffs and the other Class members.

## JURISDICTION AND VENUE

8.     This Court has personal jurisdiction over Defendants because Defendants reside in Maryland. Defendants direct, market, and operate their insurance business throughout the State of Maryland and make their insurance services available to residents of Maryland.

9.     This Court has subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), because at least one member of the putative classes, including Plaintiffs Harris and Yearman, are citizen of states other than Maryland,[1] and Defendants are citizens of Maryland. Plaintiffs seek damages (including actual, compensatory, and statutory, as provided by law) for Plaintiffs and the Classes in an amount to be determined at trial, but which, when aggregated among proposed classes of thousands of individuals, exceeds the $5,000,000.00 threshold for federal jurisdiction under CAFA, exclusive of interest and costs.

10.     Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and (c) because Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction, and because a substantial part of the events giving rise to the claim occurred in this District, and because certain Plaintiffs were injured in this District.

## THE PARTIES

11.     Plaintiff Rhonda Curtis, at all relevant times, was a Maryland citizen who was insured under a Geico Casualty automobile insurance policy in 2019.

---

[1] Plaintiffs Harris and Yearman are citizens, residents, and domiciliaries of Illinois.

12.    Plaintiff Keith Yearman, at all relevant times, was an Illinois citizen who was insured under a Government Employees automobile insurance policy in 2018.

13.    Plaintiff Clifton Harris, at all relevant times, was an Illinois citizen who was insured under a Geico Casualty automobile insurance policy in 2020.

14.    Defendant Geico Casualty is incorporated in Maryland and has its corporate headquarters at 5260 Western Ave, Chevy Chase, MD 20815. Geico Casualty issues insurance policies in Maryland and is registered with the Maryland Insurance Administration under the same phone numbers and address as Government Employees.

15.    Defendant Government Employees is incorporated in Maryland and has its corporate headquarters located at 5260 Western Ave, Chevy Chase, MD 20815. Government Employees issues insurance policies in Maryland and is registered with the Maryland Insurance Administration under the same phone numbers and address as Geico Casualty.

## FACTUAL BACKGROUND

### A.    *Overview of Retail Value and Private Seller Value*

16.    Throughout the country, and by leading vehicle valuation companies, vehicles are assigned multiple valuations, each of which is tied to a different category of transaction.  In this case, the most important of these transaction categories are "retail cost" (or retail value) and "private seller cost" (or private seller value).  Other categories, less relevant here, include trade-in value and wholesale value.

17.    The differences in assigned value between the categories is based to a large degree on consumer choice and market realities independent of actual condition. Consumers are willing to pay a car dealership more money than they are willing to pay a private seller for the exact same

vehicle in the exact same condition because, amongst other reasons, they have a greater likelihood of effective recourse against a car dealership than a private individual.

18.    Leading vehicle valuation companies (like NADA and Kelley Blue Book) calculate these values—private seller and retail (as well as lesser used values, like wholesale and trade-in) —without any evaluation of the actual condition of the vehicle. Indeed, Geico, through its vendor, calculates retail value without any evaluation or knowledge of the condition of the comparable (retail) vehicles.

19.    It is also based on a reasonable assumption, however, that dealerships, after purchasing a vehicle (whether at auction or as trade-in), often spend $500.00-$1,000.00 reconditioning or preparing the vehicle for re-sale. There is a general assumption that, in many cases, a car for sale from a car dealership will be in a better condition than a car for sale from a private seller.

20.    Private party valuation essentially places the insured in the position of a seller, pursuant to which ACV would be the amount the insured would receive if she sold the vehicle prior to the accident.

21.    Retail valuation places the insured in the position of a buyer, pursuant to which ACV equates to amount necessary to purchase a comparable vehicle. This conception mirrors the actual position of a total loss insured, who will likely buy a vehicle from a dealership.

22.    These transaction categories are not tied to the actual condition of the vehicle. For instance, the exact same vehicle will have a different (lower) assigned value for private seller than for retail.

**B.    *Overview of Valuing Total-Loss Vehicles***

23.     Generally, auto insurance policies are policies of indemnification: Insureds pay money in the form of premiums in exchange for the promise by the insurer that should certain events occur, the insurer will put the insured back into the same position they were in prior to the event insured against.

24.     In this circumstance, "loss" is the word to describe the monetary injury caused by the event insured against, or the monetary amount necessary for the insured to get back to the same position the insured was in prior to a given event. If, as a result of an accident, the door of an insured vehicle is physically damaged, the cost to repair the door is the "loss" suffered by the insured. This amount includes the costs of necessary parts and labor needed to fix the damage or replace the damaged parts.

25.     Where the loss approaches the value of the insured property, however, it is in the interests of the insurer to declare the vehicle a "total loss" and pay the vehicle's ACV rather than making uneconomic repairs. For instance, suppose a vehicle with an ACV of $10,000.00 is severely damaged. The cost to buy the parts and perform the labor necessary to return the vehicle to its pre-loss condition is $15,000.00. In such a case, an insurer would not be obligated to make $15,000 repairs to a vehicle whose ACV is $10,000. Instead, the insurer's liability is limited to the vehicle's pre-loss value, i.e., $10,000.00. Insurers write this loss limitation into their policies, limiting their liability to the lesser of ACV or the cost to repair or replace the damage. In this hypothetical, because the loss exceeds the ACV, the insurer would be liable only for the ACV.

26.     Of course, actual insurance policies are subject to negotiation. The parties might agree that, in the event the insured vehicle becomes a total loss, the insurer will find and purchase the exact same vehicle make and model with the exact same color and features and the exact same mileage, and provide said vehicle to the insured. Or the parties might agree that, in the event the

insured vehicle becomes a total loss, the insurer will pay the insured $1,000.00 irrespective of the value of the vehicle.

27.     Most insurers, however, do not want to be obligated to find and purchase precisely the same vehicle in the event of a total loss. Conversely, most insureds do not want a random dollar amount which may or may not approximate the insured vehicle value. Thus, the industry standard has become that insurers do not literally go and purchase the exact same vehicle with the exact same mileage for insureds – instead, insurers promise to pay insureds in money the amount it *would* cost to go out and purchase the same vehicle and leave it to the insureds whether they want to do so, or whether they want to purchase a more expensive or less expensive vehicle, or whether they want to bury the money under a tree.

28.     Also subject to negotiation (keeping in mind potential regulations or state laws) is 1) how the cost to replace the vehicle will be determined and by whom and 2) what can be deducted from that cost.

29.     For instance, a policy could provide that the cash value of the vehicle will be determined based on the average sale price of the vehicle in car dealerships from the same general location as the insured (which would necessarily be a promise to pay the retail cost of the insured vehicle), or the average trade-in value as determined by an industry source, or the average sale price on Craigslist by private sellers in the general location of the insured, or be completely silent on how the value will be determined.

30.     Parties also might or might not contract to allow for a deduction for dealer preparation or reconditioning charges. Deductions of this type generally represent (at least in part) the difference between retail value and private party value.

4876-4014-3148, v. 1

31.    Parties also may or may not contract for an automatic and general deductible and the amount of such deductible.

32.    All the aforementioned factors and issues that may or may not be addressed in a given policy are impacted by various state laws. Many states, recognizing the disparity in bargaining position and the potential ability of insurers to force insureds (many of whom are desperate to quickly procure a vehicle to replace the total-loss vehicle) into accepting an undervalue of the insured vehicle, have implemented certain restrictions and/or requirements on determining the value of a vehicle.

33.    Some states, for instance, require that the cost be determined by a recognized industry source such as NADA or Kelley Blue Book, or that an insurer offer to actually replace the vehicle, rather than simply paying an amount in money in lieu of replacement, or that the relevant cost to replace is the retail value of a vehicle rather than the private party value.

C.    *The Geico Insurance Policy*

34.    Plaintiff Curtis and Harris purchased automobile insurance policies from Defendant Geico Casualty, and Plaintiff Yearman purchased an automobile insurance policy from Defendant Government Employees. Defendants Geico Casualty and Government Employees issued materially identical insurance policies to Plaintiffs and putative class members.

35.    Plaintiff Yearman's Policy (analyzed herein for exemplary purposes) is attached hereto as **Exhibit A**. The Policy provides that Geico will pay for loss caused by damage to the vehicle through Collision and Comprehensive coverage, which cover physical damage caused by motor vehicle accidents. (Ex. A at 8–9).

36.    The Policy promises to pay for such loss in money, or to repair or replace the damaged or stolen property. (*Id.* at 11).

8

37.    The Policy limits Geico's liability for loss, with respect to "Collision" and "Comprehensive" coverage, to the "actual cash value of the property at the time of loss." (*Id.* at 10).

38.    The Policy provides: "***Actual cash value*** is the replacement cost of the auto or property less ***depreciation*** or ***betterment***." (*Id.* at 7).

39.    In determining a vehicle to be a total loss, Geico is also necessarily determining that the ACV is the basis of the amount owed to insureds, because in the insurance industry, a "total loss" is the term used to describe a situation where the cost to restore the vehicle to its pre-loss position by repairing or replacing the damage is higher than the pre-loss ACV of the vehicle. In other words, whether by restoring the damaged vehicle or paying the cost to purchase precisely the same vehicle, the end result for the insured is the same – an undamaged vehicle. If putting the insured in that position through payment of ACV and then recovering the salvage value through sale at a salvage auction will cost the insurer less than repairing the vehicle, the loss is called a "total loss."

40.    With respect to the determination of ACV, the Policy does not state the method by which the vehicle's ACV will be determined.  For example, the Policy does not state whether the ACV will be calculated based on an average of public prices by car dealerships in the area, or private party value, or any other method.

**D.    *Maryland and Illinois Law Require Total Loss Payments be Paid on Retail Value Basis***

41.    The Policy is subject to, and governed by, the laws of the state of issue—here, Maryland and Illinois, respectively. (*See, e.g., id.* at 16 ("The policy and any amendment(s) and endorsement(s) are to be interpreted pursuant to the laws of the state of Illinois.")); *see also Medex v. McCabe*, 811 A.2d 297, 304 (Md. 2002) ("[A] contract conflicting with public policy set forth

in a statute is invalid to the extent of the conflict between the contract and that policy.");

*Progressive Universal Ins. Co. of Ill. v. Liberty Mut. Fire Ins. Co.*, 828 N.E.2d 1175, 1180 (Ill.

2005) (where a provision in an insurance policy conflicts with the law, the statute will control).

42.    When paying cash settlements on total loss claims, Maryland law ***requires*** insurers

to pay "retail value" at a minimum. Specifically, the Maryland Code of Regulations provides:

**Section 31.15.12.04 – Cash Settlement**

If an insurer elects to make a cash settlement for the total loss of a motor vehicle
pursuant to Regulation .03 of this chapter, ***the insurer's minimum offer***, subject to
applicable deductions, ***shall be***:

A. The total of:

    (1)   The ***retail value*** for a substantially similar motor vehicle from a
nationally recognized valuation manual or from a computerized data
base that produces statistically valid fair market values for a
substantially similar vehicle as defined in Regulation .02B(7) of this
regulation; and

    (2)   Regardless of whether the claimant retains salvage rights, the
applicable taxes and transfer fees pursuant to COMAR 11.11.05; or

43.    Similarly, Illinois law requires insures pay retail value, at minimum, in settling total

loss automobile claims.

**Ill. Admin. Code tit. 50 § 919.80 – Required Claim Practices – Private
Passenger Automobiles – Property and Casualty Companies**

. . .

(c) Total Loss Vehicle Claims.

When the insured vehicle has been determined a total loss, and the insurance
policy provides for the adjustment and settlement of first party vehicle claims
on the basis of actual cash value or replacement, the company . . . shall follow
one of the following methods:

(1) The company may elect to replace the insured vehicle . . .

. . .

(2)  The company may elect to pay a cash settlement.  The company shall use one of the following methodologies to determine the market value of the insured vehicle:  The cash settlement may be based upon *the retail value* of the vehicle as determined from one of the following sources:

A)  A source or sources which are published on a regular basis, at least once every 2 months, and contain the average *retail*, wholesale and finance value for all makes and models for at least each of the last 5 model years, as well as a listing and price for all major options; or

B)  An electronically computerized source or sources:

i.  That compute statistically valid *retail values*, including all major options and equipment, and applicable allowances for mileage and condition, for at least 85% of all makes and models for at least each of the last 15 model years;

ii.  By which the *retail value* so generated shall be based on data from the area immediately surrounding the location where the insured vehicle was principally garaged and such value shall be based upon data compiled on at least 1.5 million passenger vehicles;

iii.  That compile, maintain and provide, upon request, a record of valuations and monthly summaries of the average *retail value*, option value, and mileage for each general metropolitan area for the preceding 24 month period.

44.    Illinois further confirms that insurers must pay retail value by stating that "[d]eductions of the kind commonly referred to as 'get ready to go' and 'dealer prep', or dealer preparation, charges are prohibited." *Id.* at § 919.80(c)(3)(B).

45.    The requirement that automobile insurers in Maryland and Illinois pay "retail value" when settling total loss vehicle claims reflects the considered judgment of lawmakers in those states and express public policy.

46.    Many states have enacted parallel statutes and regulations governing total loss settlement payments, which require insurers to pay total loss claims on the basis of fair market

value or replacement cost *without reference* to retail value. *See, e.g.*, Colo. Rev. Stat. § 10–4–639(3); Minn. Stat. § 72A.201, Subd. 6(1).[2]

47.     Accordingly, under the Policy's terms, conformed to comply with, respectively, Maryland and Illinois law, Geico was required to pay total loss cash settlement claims based on the retail value of the loss vehicle, not private party value.[3]

48.     Geico has uniformly breached its duty to pay retail value on total loss automobile claims to Plaintiffs and members of the putative Classes.

E.     *Geico's Method for Determining Vehicle ACV*

49.     Geico engages a vendor, CCC Information Services, Inc. ("CCC"), to assist with computing vehicle values and determining ACV for purposes of paying total loss claims. Geico uses the "CCC One" software platform to create "Market Valuation Reports" that purport to show ACV calculations.

50.     Defendants Geico Casualty and Government Employees both used Market Valuation Reports created by CCC in adjusting total loss claims for Plaintiffs and members of the

---

[2] States vary on whether to require ACV to be determined based on retail cost or whether to instead permit it to be based on private party cost. The majority of states permit it to be based on private party cost, while a sizeable minority—including Illinois and Maryland—require it to be based on retail cost. The question turns on whether to conceive of the insured as in the position of a seller or a buyer. If the insured is conceived of as in the position of a seller, where the relevant amount is how much the insured could have sold the vehicle for prior to the loss, then it makes sense to permit ACV to be based on private party cost. If the insured is conceived of as in the position of the buyer, where the relevant amount is how much it will cost the insured to purchase a vehicle to replace the totaled vehicle, then it makes sense to require payment of retail cost. Plaintiffs believe the latter is more sensible, given that most people insure vehicles not as an asset that they can sell at some point, but rather for its function and use. But in any event, the debate, while interesting, is irrelevant—GEICO must abide by the various state regulations, and while it can calculate ACV based on private party value in most states, it cannot do so in Illinois or Maryland.

[3] To the extent the Policy conflicts with the Maryland or Illinois requirement to calculate ACV based on retail value, not private party value, the state law controls by operation of law. Moreover, the Policy itself asserts that it is conformed to comply with state law. *See also Connors v. Gov't Emples. Ins. Co.*, 442 Md. 466, 478 n.10 (Md. Ct. App. 2015).

Classes. Defendants used a materially identical method for computing ACV for Plaintiffs and all class members.

51.     The Market Valuation Reports for Plaintiffs Curtis, Yearman, and Harris (discussed in more detail *infra*) are attached hereto as **Exhibits B, C, and D**, respectively.

52.     The CCC One software and platform is designed for and marketed to insurance companies.

53.     Geico contracts with CCC, which allows Geico to access and use the platform and Market Valuation Reports to adjust and settle total loss claims.

54.     As a uniform and standard business practice, Geico uses the CCC platform to determine the ACV for every total loss vehicle claim paid by Geico.

55.     The CCC Market Value Reports calculate vehicle values first by identifying the list price of comparable vehicles available for sale, *i.e.*, vehicles of the same year, make, and model. *See, e.g.*, Exhibit B, at 2 (describing first step of process as identifying "comparable vehicles" from CCC's "database") and 8–11 (comparable vehicles used for Plaintiff's valuation).

56.     CCC then adjusts sale price of each comparable vehicle to account for differences between the comparable vehicles and the total-loss vehicle. Specifically, upward or downward adjustments to the listed price of comparable vehicles are made based on "options" and "mileage" of the insured vehicle versus the comparable vehicles. For example, if the comparable vehicle has less mileage than the total-loss vehicle, CCC reduces the sale price of the comparable vehicle to account for the fact that vehicles with more mileage have less value.

57.     Plaintiffs do not challenge Geico's application of mileage or options adjustments. Nor do Plaintiffs challenge Geico's selection of the comparable vehicles to use as the starting point.

4876-4014-3148, v. 1

58.    CCC has four "condition" values—exceptional, dealer ready (or retail), average private party, and poor. Geico assumes all the comparable vehicles are retail condition, but applies an improper "Condition Adjustment" to take the value from retail value to private party value, in violation of the Policy, Maryland, and Illinois law.

59.    In other words, CCC assumes every comparable vehicle is in retail condition, and thus imposes the "condition adjustment" to take the comparable vehicles from retail to private party. This adjustment is typically hundreds of dollars, and sometimes can range up to or even exceeding $1,000.00.[4]

60.    The valuation reports contain a cursory explanation, noting "The Condition Adjustment sets that comparable vehicle to Average Private condition[.]" This admission confirms that Defendants' total loss payments were not paid on a retail value basis.

61.    As set forth above, Geico gathers a select number of similar vehicles of the same make, model, and year as the insured vehicle. Geico then applies an adjustment based on the mileage of the comparable vehicles compared to the mileage of the total loss vehicle. Geico is, thus far, using the retail value to determine ACV, just as it is required to do.

62.    Geico also applies an "options" adjustment, to account for differences in the optional equipment between the comparable vehicle and the total-loss vehicle. For example, if the total-loss vehicle has climate control but the comparable vehicle does not, Geico, through CCC,

---

[4] After the base value (with the condition adjustment applied to all comparable vehicles) is determined, CCC then makes adjustments based specifically on the condition of component parts of the total-loss vehicle itself, i.e., tires, interior, paint, etc. Said another way, the across-the-board "condition adjustment" is made to reduce the ***comparable*** vehicles to private party value to determine the base value, but then the condition of the ***total-loss*** vehicle is examined to arrive at the final adjusted vehicle value. So if the total-loss vehicle is in poor condition, a further reduction is imposed. Theoretically, however, all component parts of the total-loss vehicle might be in retail condition, meaning that the across-the-board "condition adjustment" would be wiped away. Plaintiffs account for this possibility in the proposed Class definitions by excluding those insureds who were paid retail value.

4876-4014-3148, v. 1

would increase the price of the comparable vehicle to account for such difference (or vice versa). Thus far, Geico is still using retail value to determine ACV, just as it is required to do.

63.     However, Geico then applies the aforementioned "condition adjustment" to the retail prices of the comparable vehicle to reduce the value from retail to private party.

64.     As such, through the CCC One software—and as reflected in the Market Valuation Report—Geico does not use the "retail value" of the total loss vehicle in determining the ACV.

65.     This condition adjustment is functionally equivalent to a dealer prep or reconditioning or "get ready and go" adjustment. "Condition adjustment" is just the term that the CCC software happens to use. All such adjustments reflect the increased value where car dealerships take a car and get it into dealer ready condition.

66.     By applying the adjustment to reduce the comparable vehicles from retail to private party, Defendants impose the "dealer prep" adjustment explicitly prohibited by Illinois law.

67.     By applying the "condition adjustment" deduction, Geico is basing ACV on the private party value rather than retail value, in breach of its Policy and both Maryland and Illinois law.

F.     ***Defendants Failed to Pay Plaintiffs the ACV to Which They Were Entitled Because They Applied a Downward "Condition Adjustment" and Paid Private Party Value Rather Than Retail Value.***

**Plaintiff Curtis**

68.     Plaintiff Curtis owned a 2013 Nissan Altima, insured by Defendant Geico Casualty under a Maryland auto policy.

69.     On or about December 1, 2019, Plaintiff Curtis was involved in an accident while operating the Insured Vehicle. Following the accident, Plaintiff Curtis filed a property damage claim with Geico Casualty, claim number 0455161120101070-01.

70.    Geico Casualty declared Plaintiff Curtis' vehicle was a total loss. Thus, Geico Casualty purported to adjust and settle the claim based on ACV.

71.    The CCC Market Valuation Report used by Geico Casualty reflected a base value of the insured vehicle of $8,519.00. (Ex. B, at 1).

72.    To determine the base value, Geico Casualty considered the average retail price of twelve comparable vehicles from dealerships close to Plaintiff Curtis, all of which were the same make, model, and year as the insured vehicle. (*Id.* at 8–10).

73.    Geico Casualty then imposed a negative $841.00 "Condition Adjustment" to the list price of each comparable vehicle considered in the Market Valuation Report, thereby reducing the value from retail to private party. (*Id.* at 8–11).

74.    The Market Valuation Report explains that the "condition adjustment" sets the comparable vehicles to "Average Private condition." (*Id.* at 8.)

75.    Geico Casualty did not determine the insured vehicle's "base value" based on the average retail value of comparable vehicles, but rather, based on the lesser average private owner value of comparable vehicles.

76.    Geico then further subtracted $88.00 based on the condition of one element of the vehicle. (*Id.* at 6.)

77.    Plaintiff Curtis does not contest that the CCC report accurately reflects the average comparable vehicle retail price. Nor is it relevant to Plaintiff Curtis's allegations whether the CCC report accurately or inaccurately reflects the difference between average retail value and average private party value. Whatever the difference might be, the Policy and Maryland law require Geico Casualty to pay the *retail* value. Geico paid $921.00 less than retail value ($841.00 + $88.00).

4876-4014-3148, v. 1

78.     Geico Casualty breached its contract with Plaintiff Curtis by failing to use retail value in determining the ACV cash payment.

**Plaintiff Yearman**

79.     Plaintiff Yearman owned a 2014 Toyota Prius, insured by Defendant Government Employees under an Illinois auto policy.

80.     On or about November 26, 2018, Plaintiff Yearman was involved in an accident while operating his insured vehicle. Following the accident, Plaintiff Yearman filed a property damage claim with Government Employees, claim number 0169353080101116-01.

81.     Government Employees declared Plaintiff Yearman's vehicle was a total loss. Thus, Government Employees purported to adjust and settle the claim based on ACV.

82.     The CCC Market Valuation Report used by Government Employees reflected a base value of the insured vehicle of $11,670.00. (Ex. C, at 1).

83.     To determine the base value, Government Employees considered the average retail price of twelve comparable vehicles from dealerships close to Plaintiff Yearman, all of which were the same make, model, and year as the insured vehicle. (*Id.* at 8–10).

84.     Government Employees then imposed a negative $972.00 "Condition Adjustment" to the list price of each comparable vehicle considered in the Market Valuation Report, thereby reducing the value from retail to private party. (*Id.* at 9–10).

85.     The Market Valuation Report explains that the "condition adjustment" sets the comparable vehicles to "Average Private condition." (*Id.* at 8.)

86.     Government Employees did not determine the insured vehicle's "base value" based on the average retail value of comparable vehicles, but rather, based on the lesser average private owner value of comparable vehicles.

4876-4014-3148, v. 1

87.     Government Employees then added back $672.00 because CCC determined that much of the vehicle was in "Dealer Retail" condition. (*Id.* at 6-7.)

88.     Plaintiff Yearman does not contest that the CCC report accurately reflects the average comparable vehicle retail price. Nor is it relevant to Plaintiff Yearman's allegations whether the CCC report accurately or inaccurately reflects the difference between average retail value and average private party value. Whatever the difference might be, the Policy and Illinois law require Government Employees to pay the *retail* value. Government Employees paid $300.00 less than retail value ($972.00 - $672.00).

89.     Government Employees breached its contract with Plaintiff Yearman by failing to use retail value to replace the Insured Vehicle in determining the ACV cash payment.

### Plaintiff Harris

90.     Plaintiff Harris owned a 2008 BMW 528i, insured by Defendant Geico Casualty under an Illinois auto policy.

91.     On or about March 13, 2020, Plaintiff Harris was involved in an accident while operating the Insured Vehicle. Following the accident, Plaintiff Harris filed a property damage claim with Geico Casualty, claim number 0654065220000002-01.

92.     Geico Casualty declared Plaintiff Harris' vehicle was a total loss. Thus, Geico Casualty purported to adjust and settle the claim based on ACV.

93.     The CCC Market Valuation Report used by Geico Casualty reflected a base value of the insured vehicle of $2,926.00. (Ex. D, at 1).

94.     To determine the base value, Geico Casualty considered the average retail price of twelve comparable vehicles from dealerships close to Plaintiff Harris, all of which were the same make, model and year as the insured vehicle. (*Id.* at 9–10).

95.    Geico Casualty then imposed a negative $843.00 "Condition Adjustment" to the list price of each comparable vehicle considered in the Market Valuation Report, thereby reducing the value from retail to private party. (*Id.* at 9–10).

96.    The Market Valuation Report explains that the "condition adjustment" sets the comparable vehicles to "Average Private condition." (*Id.* at 9).

97.    Geico Casualty did not determine the insured vehicle's "base value" based on the average retail value of comparable vehicles, but rather, based on the lesser average private owner value of comparable vehicles.

98.    Geico Casualty then added back $258.00 because CCC determined that some of the vehicle was in "Dealer Retail" condition. (*Id.* at 7-8.)

99.    Plaintiff Harris does not contest that the CCC report accurately reflects the average comparable vehicle retail price. Nor is it relevant to Plaintiff Harris' allegations whether the CCC report accurately or inaccurately reflects the difference between average retail value and average private party value. Whatever the difference might be, the Policy and Illinois law require Geico Casualty to pay the *retail* value. Geico Casualty paid $585.00 less than retail value ($843.00 - $258.00).

100.   Geico Casualty breached its contract with Plaintiff Harris by failing to use retail value to replace the Insured Vehicle in determining the ACV cash payment.

## CLASS ACTION ALLEGATIONS

101.   Plaintiffs bring this action individually and as a class action under Fed. R. Civ. P 23(a) and (b), on behalf of the following proposed Classes, with Plaintiff Curtis representing the Maryland Class, and Plaintiffs Yearman and Harris representing the Illinois Class:

> **The Maryland Class**. All persons: (a) who insured a vehicle for physical damage coverage under a Maryland automobile insurance policy issued by

4876-4014-3148, v. 1

Geico Casualty Insurance Company, (b) who made a claim under the policy comprehensive and/or collision coverage, (c) whose claim was determined to be a covered total loss, and (d) for whom Geico Casualty Insurance Company applied a "condition adjustment" to the retail price of comparable vehicles and who were therefore paid less than retail value for their total-loss vehicle.

**The Illinois Class**. All persons: (a) who insured a vehicle for physical damage coverage under an Illinois automobile insurance policy issued by Geico Casualty Insurance Company or Government Employees Insurance Company ("Geico"), (b) who made a claim under the policy comprehensive and/or collision coverage, (c) whose claim was determined to be a covered total loss, and (d) for whom Geico applied a "condition adjustment" to the retail price of comparable vehicles and who were therefore paid less than retail value for their total-loss vehicle.

102.    Excluded from the Classes are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Judge(s) and Court staff assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

103.    **Numerosity:** The members of the Classes are so numerous that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are thousands of members of each of the Classes, the precise number is unknown to Plaintiffs, but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

104.    **Commonality and Predominance:** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

4876-4014-3148, v. 1

a. whether Defendants are required to base their ACV settlement payments on retail value;

b. whether Defendants' application of a "condition adjustment" to comparable vehicles when determining an insured vehicle's ACV in the settlement of total loss claims constitutes a breach of contract;

c. whether the condition adjustment constitutes the equivalent of a "dealer prep" adjustment in violation of state law and in breach of the Policy;

d. the amount and nature of relief to be awarded to Plaintiffs and the other Class members.

105.    **Typicality:** Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the other Class members were all similarly affected by Defendants' application of a "condition adjustment" to ACV total loss settlement payments under insurance policies that provided for an ACV payment in the event of total loss. Plaintiffs' claims are based upon the same legal theories as those of the other Class members. Plaintiffs and the other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Defendants engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

106.    **Adequacy:** Plaintiffs are adequate representatives of the Classes because Plaintiffs' interests do not conflict with the interests of the other Class members, Plaintiffs have retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds by failing to pay ACV in total loss situations, and Plaintiffs intend to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected.

107.    **Superiority:**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate each separate claim against Defendants, such that it would be impracticable for the Class members to individually seek redress for Defendants' wrongful conduct. Even if the Class members could afford individualized litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### COUNT 1: BREACH OF CONTRACT
*(Plaintiff Curtis and the Maryland Class v. Geico Casualty Company)*

108.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1–107 as if fully set forth herein.

109.    Plaintiff Curtis bring this claim individually and on behalf of the other members of the Maryland Class.

110.    Plaintiff Curtis and each of the other Maryland Class members were parties to insurance contracts with Geico Casualty, with terms set forth in the Policy.

111.    Plaintiff Curtis and each of the other Maryland Class members made claims under their insurance contracts, which Geico Casualty determined to be first-party total losses under the insurance contract, and additionally determined to be covered claims.

112.    Geico Casualty invoked its ACV limit of liability clause and purported to pay Plaintiff Curtis and each of the other Maryland Class members the ACV of their total loss vehicles.

113.    Under the Policy, Geico Casualty's ACV payment was required to be based on the vehicle's retail value. Instead, however, through application of a condition adjustment, Geico Casualty's ACV payment was based on private party value, not retail value.

114.    Geico Casualty breached its contracts with Plaintiff Curtis and each of the other Maryland Class members.

115.    As a result of the contractual breaches, Plaintiff Curtis and each of the other Maryland Class members have been damaged in that they received less than what was promised in their contracts, and they are entitled to actual damages in the amount of the condition adjustments divided by the number of comparable vehicles to which such adjustments were made, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

## COUNT 2: BREACH OF CONTRACT
### (*Plaintiff Yearman v. Government Employees Insurance Company*)

116.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1–107 as if fully set forth herein.

117.    Plaintiff Yearman bring this claim individually and on behalf of the other members of the Illinois Class insured by Government Employees Insurance Company.

118.    Plaintiff Yearman and each of the other Illinois Class members insured by Government Employees were parties to insurance contracts with Government Employees, with terms set forth in the Policy.

119.    Plaintiff Yearman and each of the other Illinois Class members insured by Government Employees made claims under their insurance contracts, which Government

4876-4014-3148, v. 1

Employees determined to be first-party total losses under the insurance contract, and additionally determined to be covered claims.

120.    Government Employees invoked its ACV limit of liability clause and purported to pay Plaintiff Yearman and other Illinois Class members the ACV of their total loss vehicles.

121.    Under the Policy, Government Employee's ACV payment was required to be based on the vehicle's retail value. Instead, however, through application of a condition adjustment, Government Employee's ACV payment was based on private party value, not retail value.

122.    The condition adjustment also constituted the functional equivalent of a "dealer prep" adjustment in violation of Illinois law, incorporated into the Policy.

123.    Government Employees breached its contracts with Plaintiff Yearman and other Illinois Class members that made total loss claims to it.

124.    As a result of the contractual breaches, Plaintiff Yearman and each of the other Illinois Class members insured by Government Employees have been damaged in that they received less than what was promised in their contracts, and they are entitled to actual damages in the amount of the condition adjustments divided by the number of comparable vehicles to which such adjustments were made, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

## COUNT 3: BREACH OF CONTRACT
### (*Plaintiff Harris v. Geico Casualty Company*)

125.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1–107 as if fully set forth herein.

126.    Plaintiff Harris bring this claim individually and on behalf of the other members of the Illinois Class insured by Geico Casualty.

127.    Plaintiff Harris and each of the other Illinois Class members insured by Geico Casualty were parties to insurance contracts with Geico Casualty, with terms set forth in the Policy.

128.    Plaintiff Harris and each of the other Illinois Class members insured by Geico Casualty made claims under their insurance contracts, which Geico Casualty determined to be first-party total losses under the insurance contract, and additionally determined to be covered claims.

129.    Geico Casualty invoked its ACV limit of liability clause and purported to pay Plaintiff Harris and other Illinois Class members the ACV of their total loss vehicles.

130.    Under the Policy, Geico Casualty's ACV payment was required to be based on the vehicle's retail value. Instead, however, through application of a condition adjustment, Geico Casualty's ACV payment was based on private party value, not retail value.

131.    The condition adjustment also constituted the functional equivalent of a "dealer prep" adjustment in violation of Illinois law, incorporated into the Policy.

132.    Geico Casualty breached its contracts with Plaintiff Harris and other Illinois Class members that made total loss claims to it.

133.    As a result of the contractual breaches, Plaintiff Harris and each of the other Illinois Class members insured by Government Employees have been damaged in that they received less than what was promised in their contracts, and they are entitled to actual damages in the amount of the condition adjustments divided by the number of comparable vehicles to which such adjustments were made, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

**REQUEST FOR RELIEF**

4876-4014-3148, v. 1

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

a.      An order certifying the proposed Classes as requested herein, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned attorneys as Counsel for the Classes;

b.      An award of compensatory damages, and all other available damages, for Plaintiffs and the other Class members against Geico, as well as pre- and post- judgment interests on any amounts awarded;

c.      An order enjoining Geico Casualty Company and Government Employees Insurance Company from continuing the illegal practices alleged herein, and for other injunctive relief as is proven appropriate in this matter;

d.      An award of attorney's fees, expenses, and costs of suit as appropriate pursuant to applicable law

e.      An order providing such other and further forms of relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

4876-4014-3148, v. 1

Dated: July 27, 2022.

Respectfully submitted,

James P. Ulwick (Bar No. 00536)
John A. Bourgeois (Bar No. 11834)
**KRAMON & GRAHAM, P.A.**
One South Street
Suite 2600
Baltimore, MD 21202-3201
Tel: 410-752-6030
Facsimile: 410-539-1269
E-Mail: julwick@kg-law.com
        jbourgeois@kg-law.com


Edmund A. Normand
(*pro hac vice* forthcoming)
Florida Bar No.: 865590
**NORMAND PLLC**
3165 McCrory Place, Ste. 175
Orlando, Florida 32803
Tel: 407-603-6031
E-Mail: ed@ednormand.com
E-Mail: ean@normandpllc.com

***Attorneys for Plaintiff***


* motion for *pro hac vice* admission to be filed