IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RHONDA CURTIS, et al.,

    *Plaintiffs*,

    v.

GEICO CASUALTY COMPANY, et al.,

    *Defendants*.

Civil Action No. ELH-22-1857

## MEMORANDUM OPINION

Plaintiffs Rhonda Curtis, Clifton Harris, and Keith Yearman, individually and on behalf of a putative class, filed suit on July 27, 2022, against defendants GEICO Casualty Company ("GEICO Casualty") and Government Employees Insurance Company ("Government Employees") (collectively, the "Insurers" or "GEICO").   ECF 1 ("Class Action Complaint"). Plaintiffs Yearman and Harris are citizens of Illinois and Curtis is a citizen of Maryland.  *Id*. ¶¶ 11, 12, 13.  Defendants are incorporated in Maryland.  *Id*. ¶¶ 14, 15.

At the relevant time, each plaintiff had "Comprehensive" and "Collision" first-party automobile coverage through one of the defendants.  *Id.* ¶ 2.  Plaintiffs allege, *inter alia*, that defendants have "a routine policy and practice of underpaying insureds for total loss claims in violation of [defendants'] policies and binding Maryland and Illinois law."  *Id.* ¶ 1.

Jurisdiction is predicated on the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A).  *Id.* ¶ 9.  Plaintiffs seek damages, "which, when aggregated among proposed classes of thousands of individuals, exceeds . . . $5,000,000.00."  *Id.*

Defendants have moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6).  ECF 10.  The motion is supported by a memorandum (ECF 10-1) (collectively, the "Motion to Dismiss"), as

well as two exhibits, discussed *infra*.  *See* ECF 10-2; ECF 10-3.  Plaintiffs oppose the Motion to

Dismiss.  ECF 25 (the "Opposition").  Defendants have replied.  ECF 31 (the "Reply").

Pursuant to Fed. R. Civ. P. 21, defendants have also moved to sever the claims of Harris

and Yearman from Curtis's claim.  ECF 11.  The motion is supported by a memorandum (ECF 11-

1) (collectively, the "Motion to Sever"), as well as an exhibit.  ECF 11-2.  The Insurers claim, *inter*

*alia*, that severance is warranted because Harris and Yearman are citizens of Illinois, Curtis is a

citizen of Maryland, and there are differences in the laws of Maryland and Illinois.  Plaintiffs

oppose the motion (ECF 26) and defendants replied.  ECF 32.

In addition, defendants have filed a "Motion to Compel Appraisal and to Stay Matter

Pending Appraisal."  ECF 33 ("Motion to Stay").  Plaintiffs oppose the Motion to Stay (ECF 34)

and defendants replied.  ECF 35.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that

follow, I shall grant the Motion to Dismiss.  Therefore, I shall deny the Motion to Sever and the

Motion to Stay as moot.

## I. Factual and Procedural Background[1]

As noted, the Insurers are incorporated in Maryland.  ECF 1, ¶¶ 14, 15.  Each plaintiff was

a named insured under a "Family Automobile Insurance Policy" issued by defendants.  *Id.* ¶ 2; *see*

ECF 1-2 ("Yearman Policy"); ECF 10-2 ("Curtis Policy"); ECF 10-3 ("Harris Policy").  In 2019,

Curtis, a Maryland citizen, insured her 2013 Nissan Altima under a GEICO Casualty automobile

---

[1] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit.
*See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).  And, as I also discuss, *infra*, I may
consider the exhibits submitted by the parties.

Throughout the Memorandum Opinion, the Court cites to the electronic pagination.
However, the electronic pagination does not always correspond to the page number imprinted on
the particular submission.

insurance policy.  ECF 1, ¶¶ 11, 68; *see* ECF 10-2. Yearman is an Illinois citizen.  In 2018, he insured his 2014 Toyota Prius under a Government Employees automobile insurance policy. ECF 1, ¶¶ 12, 79; *see* ECF 1-2.  And, Harris is an Illinois citizen who, in 2020, insured his 2008 BMW 528i under a GEICO Casualty automobile insurance policy.  ECF 1, ¶¶ 13, 90; *see* ECF 10-3.

According to plaintiffs, the Insurers "issued materially identical insurance policies to Plaintiffs."  ECF 1, ¶ 34.  Each policy limits GEICO's liability for total loss of a vehicle to the "***actual cash value*** [("ACV")] of the property at the time of ***loss***."  ECF 1-2 at 11; ECF 10-2 at 10; ECF 10-3 at 12 (emphasis in originals) (alteration added); *see also* ECF 1, ¶ 2.  And, the policies define ACV as follows: "***Actual cash value*** is the replacement cost of the auto or property less ***depreciation*** or ***betterment***."  ECF 1-2 at 8; ECF 10-2 at 8; ECF 10-3 at 9 (emphasis in originals). "Betterment" is defined as "improvement of the auto or property to a value greater than its pre-loss condition."  *Id.*  And, depreciation is defined as "a decrease or loss in value to the auto or property because of use, disuse, physical wear and tear, age, outdatedness or other causes."  ECF 1-2 at 9; ECF 10-2 at 8; ECF 10-3 at 10.

Plaintiffs' vehicles were damaged such that each vehicle was declared a total loss.  ECF 1, ¶¶ 70, 81, 92.  Plaintiffs maintain that, under "Maryland and Illinois law, Geico was required to pay total loss cash settlement claims based on the retail value of the loss vehicle, not private party value."  *Id.* ¶ 47; *see also id.* ¶ 3.  However, according to plaintiffs, defendants applied "an improper 'Condition Adjustment' to take the value [of each vehicle] from retail value to private party value, in violation of the [policies], Maryland, and Illinois law."  *Id.* ¶ 58; *see also id.* ¶¶ 6, 59, 63.

Defendants used the services of a vendor, CCC Information Services, Inc. ("CCC"), "to assist with computing vehicle values and determining ACV for purposes of paying total loss

claims." *Id.* ¶ 49.  In particular, defendants "used Market Valuation Reports created by CCC in adjusting total loss claims for Plaintiffs."  ECF 1, ¶ 50; *see* ECF 1-3 ("Curtis CCC Report"); ECF 1-4 ("Yearman CCC Report"); ECF 1-5 ("Harris CCC Report") (collectively, "CCC Reports").

The CCC Reports contain CCC's "opinion as to the value of the loss vehicle, based on information provided to CCC by GEICO."  ECF 1-3 at 2; ECF 1-4 at 2; ECF 1-5 at 3.  The information provided includes "the zip code where the loss vehicle is garaged, loss vehicle VIN, mileage, equipment, as well as loss vehicle condition, which is used to assist in determining the value of the loss vehicle."  ECF 1-3 at 3; ECF 1-4 at 3; ECF 1-5 at 4.

The CCC Reports calculate vehicle values first by identifying the list price of comparable vehicles, *i.e.*, vehicles of the same year, make, and model.  ECF 1, ¶ 55.  According to the CCC Reports, "CCC maintains an extensive database of vehicles that currently are or recently were available for sale in the U.S.," which includes "vehicles advertised for sale by dealerships or private parties."  ECF 1-3 at 3; ECF 1-4 at 3; ECF 1-5 at 4.  This "database is searched and comparable vehicles in the area are selected," which "are similar to the loss vehicle based on relevant factors."  *Id.*  "Vehicle Allowances" are also considered.  *Id.*  "Allowances are factors influencing the value of the loss vehicle when compared to a typical vehicle," such as a "sport package."  *Id.*

In addition, the CCC Reports list numerous items of vehicle equipment for the loss vehicle as well as the comparable vehicles, reflecting whether the various vehicles include the particular feature.  For example, these features include items such as navigation systems, tinted glass, air conditioning, and the like.  ECF 1-3 at 9-10; ECF 1-4 at 9-10; ECF 1-5 at 11-12.  CCC "then adjusts [the] sale price of each comparable vehicle to account for differences between the comparable vehicles and the total-loss vehicle."  ECF 1, ¶ 56.  The "adjustments" to the value of

4

the comparable vehicles are made based on "Make/Model/Trim," "Options," "Mileage," and "Condition.[[]]"   ECF 1-3 at 10; ECF 1-4 at 10; ECF 1-5 at 12.[2]

Plaintiffs assert that CCC "'has four condition values—exceptional, dealer ready (or retail), average private party, and poor.'"   ECF 1, ¶ 58.   The exhibits reflect that CCC assigns one of four condition descriptors for each component: "Excellent," "Dealer Retail," "Average Private," or "Rough."   ECF 1-3 at 7-8; ECF 1-4 at 7-8; ECF 1-5 at 9-10.   CCC uses "condition inspection guidelines to determine the condition of key components of the loss vehicle prior to the loss."   ECF 1-3 at 7; ECF 1-4 at 7; ECF 1-5 at 9.   These guidelines pertain to the physical characteristics of nine vehicle components: mechanical, tires, paint, body, glass, seats, carpets, dashboard, and headliner.   ECF 1-3 at 7-8; ECF 1-4 at 7-8; ECF 1-5 at 9-10.

Plaintiffs allege: "CCC assumes every comparable vehicle is in retail condition, and thus imposes the 'condition adjustment' to take the comparable vehicles from retail to private party."   ECF 1, ¶ 59.   The exhibits indicate that CCC applies a "Condition Adjustment" that "sets that comparable vehicle to Average Private Condition, which the loss vehicle is also compared to in the Vehicle Condition section."   ECF 1-3 at 9-10; ECF 1-4 at 9-10; ECF 1-5 at 11-12.   Plaintiffs assert: "This admission confirms that Defendants' total loss payments were not paid on a retail value basis."   ECF 1, ¶ 60.

According to the exhibits, "CCC makes dollar adjustments that reflect the impact the reported condition has on the value of the loss vehicle as compared to Average Private condition."   ECF 1-3 at 7; ECF 1-4 at 7; ECF 1-5 at 9.   Thus, the CCC Reports reflect that, "[i]f a component of the loss vehicle is in a better condition than Average Private condition, an upward adjustment is made; if a component is in Average Private condition, no adjustment is made; and, if a

---

[2] ECF 1-5 also permits adjustment based on "Package."   *Id.* at 12.

component is in worse than Average Private condition, a downward adjustment is made."  ECF 10-1 at 12.  For example, for Harris, the CCC Report reflects that the seats, carpet, dashboard, and "headliner" of his vehicle were determined to be in "Dealer Retail" condition.  ECF 1-5 at 9-10.

Notably, plaintiffs concede that, if "all component parts of the total-loss vehicle might be in retail condition . . . the across-the-board 'condition adjustment' would be wiped away."  ECF 1 at 14 n.4.  Similarly, the Insurers assert that "the condition adjustment is eliminated when the condition of the loss vehicle's nine key components matches the condition of the comparable vehicles (in Dealer Retail condition)."  ECF 10-1 at 13.

To illustrate, the Curtis CCC Report reflected a base value of the insured vehicle of $8,519.00.  ECF 1-3 at 2; ECF 1, ¶ 71.  GEICO Casualty considered the average retail price of twelve comparable vehicles in the vicinity.  *Id.* ¶ 72.  "Geico Casualty then imposed a negative $841.00 'Condition Adjustment' to the list price of each comparable vehicle considered in the Market Valuation Report."  *Id.* ¶ 73 (citing ECF 1-3 at 10).  "Geico then further subtracted $88.00 based on the condition of" the vehicle's tires.  ECF 1, ¶ 76 (citing ECF 1-3 at 7).  Accordingly, plaintiffs allege that "Geico paid $921.00 less than retail value" (ECF 1, ¶ 77), and "breached its contract with Plaintiff Curtis by failing to use retail value in determining the ACV cash payment. *Id.* ¶ 78.

The Yearman CCC Report reflected a base value of the insured vehicle of $11,670.00.  ECF 1-4 at 2.  Plaintiffs assert that "Government Employees imposed a negative $972.00 'Condition Adjustment' to the list price of each comparable vehicle considered in the Market Valuation Report, thereby reducing the value from retail to private party."  ECF 1, ¶ 84 (citing ECF 1-4 at 10).  Further, plaintiffs allege: "Government Employees then added back $672.000 because CCC determined that much of [Yearman's] vehicle was in 'Dealer Retail' condition."

6

ECF 1, ¶ 81 (citing ECF 1-4 at 8).  Thus, according to plaintiffs, "Government Employees paid $300.00 less than retail value ($972.00 - $672.00)" (ECF 1, ¶ 88), and "breached its contract with Plaintiff Yearman by failing to use retail value to replace the Insured Vehicle in determining the ACV cash payment."  ECF 1, ¶ 89.

As to Harris, the Harris CCC Report reflected a base value of the insured vehicle of $2,926.00.  ECF 1-5 at 3.  "Geico Casualty then imposed a negative $843.00 'Condition Adjustment' to the list price of each comparable vehicle, thereby reducing the value from retail to private party." ECF 1, ¶ 95 (citing ECF 1-5 at 12).  But, GEICO Casualty "added back $258.00 because CCC determined that some of the vehicle was in 'Dealer Retail' condition."  ECF 1, ¶ 98 (citing ECF 1-5 at 10).  Accordingly, plaintiffs allege that "Geico Casualty paid $585.00 less than retail value ($843.00 - $258.00) (ECF 1, ¶ 99), and "breached its contract with Plaintiff Harris by failing to use retail value to replace the Insured Vehicle in determining the ACV cash payment." *Id.* ¶ 100.

Notably, plaintiffs do not contest that the CCC Reports accurately reflected "the average comparable vehicle retail price."  ECF 1, ¶¶ 77, 88, 99.  Nor do plaintiffs challenge application of mileage or option adjustments, or the selection of the comparable vehicles.  *Id.* ¶ 57.  But, they insist that the Insurers are obligated to pay the retail value, and failed to do so.  *Id.* ¶¶ 64-67, 77, 88, 99; *id.* at 15, § F.

In addition to alleging breaches of the insurance policies, plaintiffs contend that defendants have violated the laws of Illinois and Maryland.  *Id.* ¶¶ 41-48, 67.  In particular, plaintiffs allege that both Maryland and Illinois law require total loss payments based on retail value.  They cite Code of Maryland Regulations ("COMAR") 31.15.12.04 and Ill. Admin. Code tit. 50 § 919.80. *Id.* ¶¶ 42, 43.

In sum, plaintiffs allege that defendants failed to pay the ACV to which plaintiffs were entitled, because they applied "a downward 'Condition Adjustment' and paid private party value rather than retail value."  ECF 1 at 15, § F.  As noted, they state that each "Market Valuation Report explains that the condition adjustment sets the comparable vehicles to 'Average Private condition." *Id*. ¶ 74 (quoting ECF 1-3 at 9); ECF 1, ¶ 85 (quoting ECF 1-4 at 9); ECF 1, ¶ 96 (citing ECF 1-5 at 11).  And, they conclude: "By applying the 'condition adjustment' deduction, Geico is basing ACV on the private party value rather than retail value, in breach of [the policies] and both Maryland and Illinois law."  ECF 1, ¶ 67.  Consequently, "Plaintiffs bring this class action to recover for (and put an end to) Geico's systematic underpayment of total loss first-party auto insurance claims in Maryland and Illinois."  *Id*. ¶ 1.

The policies also contain an appraisal clause, which states, ECF 1-2 at 12; ECF 10-2 at 11; ECF 10-3 at 13 (emphasis in originals):

> If we and the ***insured*** do not agree on the amount of ***loss***, either may, within 60 days after proof of loss is filed, demand an appraisal of the ***loss***.  In that event, we and the ***insured*** will each select a competent appraiser.  The appraisers will select a competent and disinterested umpire.  The appraisers will state separately the ***actual cash value*** and the amount of the ***loss***.  If they fail to agree, they will submit the dispute to the umpire.  An award in writing of any two will determine the amount of ***loss***.  We and the ***insured*** will each pay his chosen appraiser and will bear equally the other expenses of the appraisal and umpire.
> We will not waive our rights by any of our acts relating to appraisal.

Additionally, the policies provide: "Suit will not lie against [defendants] unless the policy terms have been complied with and until 30 days after proof of loss is filed and the amount of ***loss*** is determined."  ECF 1-2 at 11; ECF 10-2 at 11; ECF 10-3 at 13 (emphasis in originals) (alteration added).

On August 29, 2022, through counsel, defendants sent letters to plaintiffs invoking the right to appraisals.  *See* ECF 33 at 28-33 ("Letters Invoking Appraisal").  Plaintiffs' counsel responded,

stating that plaintiffs "do not believe these claims are suitable for appraisals."  ECF 33 at 35 ("Email Contesting Appraisal").

In particular, plaintiffs' counsel asserted, *id*:

The core dispute at issue is whether actual cash value under the insurance Policies and Maryland and Illinois law should be calculated based on retail value or private party value.  This, we believe, is a question of law for the courts, not an appraisable question of fact.  For at least this reason, we do not believe the appraisal clauses are applicable nor that appraisals are warranted or appropriate.

Additional facts are discussed, *infra*.

## II. Motion to Dismiss

### A. Standards of Review

### 1. Fed. R. Civ. P. 12(b)(6)

Defendants move to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6).  ECF 10.  A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short

and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 304-05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012). But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

In connection with a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R.*

*Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'"   *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

Notably, a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing.   *See, e.g.*, *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."); *Glenn v. Wells Fargo Bank, N.A.*, DKC-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not alleged in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) ("'[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss'") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"   *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).   *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan*

12

*Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Moreover, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of*

13

*Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017);

*Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).

To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also Brentzel v. Fairfax Transfer and Storage, Inc.,* 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (per curiam); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

The Complaint is supported by four exhibits.  ECF 1-2 to ECF 1-5.  As noted, ECF 1-2 is the Yearman Policy, and ECF 1-3 to ECF 1-5 are the plaintiffs' CCC Reports.  These exhibits are expressly referenced in the Complaint, and defendants do not challenge their authenticity. Accordingly, I may consider these documents at this stage.

Moreover, under the principles outlined above, I may consider the Curtis Policy (ECF 10-2) and the Harris Policy (ECF 10-3), submitted by defendants with their Motion to Dismiss (ECF

10).  This is because they are referenced in or otherwise integral to the Complaint (ECF 1), their authenticity is not disputed, and plaintiffs do not take issue with their consideration.

The Fourth Circuit has said that, "[i]n the event of conflict between the bare allegations of the complaint and any exhibit attached [to the complaint] . . . the exhibit prevails."  *So. Walk at Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 182 (second alteration in original).  Therefore, to the extent of any discrepancy between the parties' descriptions of the policies or the CCC Reports, the exhibits control.

## 2. Choice of Law

"When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *see Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co*., 736 F.3d 255, 261 n.3 (4th Cir. 2013); *Colgan Air, Inc. v. Raytheon Aircraft Co*., 507 F.3d 270, 275 (4th Cir. 2007); *Baker v. Antwerpen Motorcars, Ltd*., 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).  Maryland is the forum state.

As to contract claims, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state.  *See, e.g. Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc*., 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co*., 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014).  "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs."  *Konover Prop. Tr., Inc. v. WHE Assocs*., 142 Md. App. 476, 490, 790

A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co*., 116 Md. App.

605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

In this case, the policies contain choice of law provisions.  Curtis's Policy states: "The

policy and any amendment(s) and endorsement(s) are to be interpreted pursuant to the laws of the

state of Maryland."  ECF 10-2 at 17.  Therefore, as to Curtis, who alleges a breach of contract

under Maryland law, the Court will apply the substantive law of Maryland.  The policies for

Yearman and Harris state: "The policy and any amendment(s) and endorsement(s) are to be

interpreted pursuant to the laws of the state of Illinois."  ECF 1-2 at 17; ECF 10-3 at 20.

Accordingly, for Yearman and Harris, the Court will apply the substantive law of Illinois.

As a practical matter, the contract principles and the principles of statutory construction

are largely the same.

### B. Contract Principles

Maryland law is well settled that "the interpretation of an insurance policy is governed by

the same principles generally applicable to the construction of other contracts."  *Mitchell v. AARP*,

140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001); *see Connors v. Gov't Emps. Ins. Co.*, 442

Md. 466, 480, 113 A.3d 595, 603 (2015); *Moscarillo v. Prof'l Risk Mgmt. Servs., Inc*., 398 Md.

529, 540, 921 A.2d 245, 251 (2007); *State Farm Mut. Ins. Co. v. DeHaan*, 393 Md. 163, 193, 900

A.2d 208, 225-26 (2006); *see also Travelers Indemnity Co. of Am. v. Jim Coleman Auto. of

Columbia, LLC*, 236 F. Supp. 2d 513, 514 (D. Md. 2002).  Accordingly, "'ordinary principles of

contract interpretation apply.'"  *Megonnell v. United Servs. Auto. Ass'n*, 368 Md. 633, 655, 796

A.2d 758, 772 (2002) (citation omitted); *see Dutta v. State Farm Ins. Co*., 363 Md. 540, 556, 769

A.2d 948, 957 (2001).

Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness facts showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant." *Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*, 401 F. Supp. 3d 576, 596 (D. Md. 2019).  And, "'unlike the majority of other states, Maryland does not follow the rule that insurance policies are to be most strongly construed against the insurer.'" *Capital City Real Estate, LLC v. Certain Underwriters at Lloyds London*, 788 F.3d 375, 379 (4th Cir. 2015) (quoting *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72, 97, 699 A.2d 482, 494 (1997)); *see Beretta, U.S.A., Corp. v. Fed. Ins. Co.*, 117 F. Supp. 2d 489, 493 (D. Md. 2000); *Megonnell*, 368 Md. at 655, 796 A.2d at 771; *Bushey v. N. Assurance Co. of Am.*, 362 Md. 626, 632, 766 A.2d 598, 601 (2001); *Collier v. MD-Individual Practice Ass'n*, 327 Md. 1, 5, 607 A.2d 537, 539 (1992).

Notably, "[p]arties to a contract 'are presumed to contract mindful of the existing law and [ ] all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where a contrary intention is evident.'" *Connors,* 442 Md. at 478 n. 10, 113 A.3d at 601 n. 10 (quoting *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 344, 731 A.2d 441, 447 (1999)).  And, "when a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer." *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 280, 825 A.2d 995, 1005-06 (2003).

Similarly, in Illinois, "an insurance policy is a contract, and the same rules of construction that apply to other types of contracts apply to insurance policies." *Archer Daniels Midland Co. v. Burlington Ins. Co. Grp., Inc*., 785 F. Supp. 2d 722, 727 (N.D. Ill. 2011) (citing *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd*., 223 Ill. 2d 407, 307 Ill. Dec. 626, 860 N.E.2d 280, 285

(2006)); *see also Scottsdale Ins. Co. v. Columbia Ins. Grp.*, 972 F.3d 915, 919 (7th Cir. 2020). "In pleading a cause of action for breach of contract to provide insurance, a plaintiff must allege facts indicating the particular terms of the policy that the insurance company breached." *Weis v. State Farm Mut. Auto. Ins. Co.*, 776 N.E.2d 309, 312 (Ill. App. Ct. 2002).

And, of relevance here, "Illinois laws automatically are incorporated into all contracts of insurance in that state." *Moran v. Rush Prudential HMO, Inc.*, 230 F.3d 959, 967 (7th Cir. 2000); *see also Kapinus v. State Farm Mut. Auto. Ins. Co.*, 317 Ill. App. 3d 185, 250 Ill. Dec. 534, 738 N.E.2d 1003, 1005 (2000) ("It is well settled that, when an insurance policy is issued, applicable statutory provisions in effect at the time are treated as part of the policy."). Indeed, in addressing Ill. Admin. Code tit. 50 § 919.80, the Seventh Circuit explained that "the regulation is incorporated into the policy as a default term as a matter of law." *Sigler v. GEICO Cas. Co.*, 967 F.3d 658, 661 (7th Cir. 2020).[3]

In contrast to Maryland, in Illinois "insurance policies are to be liberally construed in favor of coverage, and where an ambiguity exists in the insurance contract, it will be resolved in favor of the insured and against the insurer." *United Servs. Auto. Ass'n v. Dare*, 357 Ill. App. 3d 955, 294 Ill. Dec. 258, 830 N.E.2d 670, 678 (2005). Furthermore, a "court will not interpret an

---

[3] In their briefing, both parties cite to *Sigler*, 967 F.3d 658, but for different propositions. *See, e.g.*, ECF 10-1 at 23 (noting that the ACV provision in the policy at issue "describes the *most* that GEICO will pay in the event of a covered loss") (emphasis in original); ECF 25 at 9 (noting that a "regulation is incorporated into the policy as a default term as a matter of law").

In *Sigler*, in the context of a total vehicle loss claim, the Seventh Circuit determined that "the Illinois insurance regulation, incorporated into the GEICO policy as a matter of law, specifically provides that a settling insurer is not required to pay sales tax and title and tag transfer fees *unless* the insured timely provides documentation that these costs were actually incurred." *Sigler*, 967 F.3d at 662 n. 3 (emphasis in original).

insurance policy in such a way that any of its terms are rendered meaningless or superfluous."

*Nat'l Casualty Co. v. Jewel's Bus Co.*, 880 F. Supp. 2d 914, 916 (N.D. Ill. 2012) (citation omitted).

### C. Discussion

### 1.

Plaintiffs allege that defendants breached their insurance policies by violating COMAR

31.15.12.04 and Ill. Admin. Code tit. 50 § 919.80.  ECF 1, ¶¶ 42, 43.[4]

COMAR 31.15.12.04 provides, in relevant part:

If an insurer elects to make a cash settlement for the total loss of a motor vehicle pursuant to Regulation .03 of this chapter, the insurer's minimum offer, subject to applicable deductions, shall be:

A. The total of:

(1) The retail value for a substantially similar motor vehicle from a nationally recognized valuation manual or from a computerized data base that produces statistically valid fair market values for a substantially similar vehicle as defined in Regulation .02B(7) of this regulation . . . .

"Retail Value" is not specifically defined in COMAR.  But, COMAR 31.15.12.02B(7)

defines a "substantially similar motor vehicle", as follows:

---

[4] Curiously, the parties do not refer to any statutes for which the regulations were promulgated.  Nor do the parties point to an agency's "construction of a statutory scheme it is entrusted to administer."  *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 548 (4th Cir. 2006).

COMAR 31.15.12.04 is authorized by Md. Code (2017 Repl. Vol.), § 27-304.1 of the Insurance Article.  It provides: "The Commissioner shall adopt regulations that establish standards and procedures for: (1) the settlement of claims involving the total loss of a private passenger motor vehicle; and (2) the determination of the private passenger motor vehicle's total loss value."

Authority for Ill. Admin. Code tit. 50 § 919.80 is found in Ill. Insurance Code § 401 (2021), which reads: "The Director is charged with the rights, powers and duties appertaining to the enforcement and execution of all the insurance laws of this State.  He shall have the power (a) to make reasonable rules and regulations as may be necessary for making effective such laws . . . ."

(7) "Substantially similar motor vehicle" means a motor vehicle that, in comparison to a damaged motor vehicle:

> (a) Is the same make and model as the damaged motor vehicle;
>
> (b) Is the same year as, or a more recent year than, the damaged motor vehicle;
>
> (c) Contains at least the same major options as the damaged motor vehicle;
>
> (d) Is in a condition substantially similar to or better than the condition of the damaged motor vehicle immediately before the damage occurred; and
>
> (e) Has mileage that is within the greater of 4,000 miles or 10 percent of the mileage on the damaged motor vehicle at the time that the damage occurred unless the vehicle is limited in production, specialty in nature, or older than 10 model years at the time of total loss.

Ill. Admin. Code tit. 50 § 919.80 provides, in relevant part:

(c) Total Loss Vehicle Claims. When the insured vehicle has been determined a total loss, and the insurance policy provides for the adjustment and settlement of first party vehicle claims on the basis of actual cash value or replacement . . . :

> (2) The company may elect to pay a cash settlement. The company shall use one of the following methodologies to determine the market value of the insured vehicle: The cash settlement may be based upon the retail value of the vehicle as determined from one of the following sources:
>
> > A) A source or sources which are published on a regular basis, at least once every 2 months, and contain the average retail, wholesale and finance value for all makes and models for at least each of the last 5 model years, as well as a listing and price for all major options; or
> >
> > B) An electronically computerized source or sources:
> >
> > > i.   That compute statistically valid retail values, including all major options and equipment, and applicable allowances for mileage and condition, for at least 85% of all makes and models for at least each of the last l5 model years;
> > >
> > > ii.  By which the retail value so generated shall be based on data from the area immediately surrounding the

> location where the insured vehicle was principally garaged and such value shall be based upon data compiled on at least 1.5 million passenger vehicles;
>
> iii.   That compile, maintain and provide, upon request, a record of valuations and monthly summaries of the average retail value, option value, and mileage for each general metropolitan area for the preceding 24 month period . . . .

(3) Provisions applicable to subsections (c)(1) and (c)(2) . . . .

> B)  Deductions of the kind commonly referred to as "get ready to go" and
>     "dealer prep", or dealer preparation, charges are prohibited . . . .

(d) Practices Concerning Travel, Loss of Use, Storage/Towing and Betterment, Replacement Crash Parts and Automobile Repairs . . . .

(4) Betterment deductions are allowable only if:

> A) The deductions:
>
> i.   Reflect a measurable decrease in market value attributable to the poorer condition of, or prior damage to, the insured vehicle . . . .

Accordingly, plaintiffs argue: "Under Maryland and Illinois law and the terms of the [policies], Geico is obligated to base any total loss cash settlement, including an ACV cash settlement, on the retail cash value of the insured vehicle."  ECF 1, ¶ 3.  Plaintiffs add: "By applying the 'condition adjustment' deduction, Geico is basing ACV on the private party value rather than retail value, in breach of its [policies] and both Maryland and Illinois law."  *Id*. ¶ 67. Notably, plaintiffs do not contend that the regulations at issue are ambiguous.

Conversely, defendants maintain that plaintiffs "erroneously conflate the term 'retail value' of the loss vehicle" in the regulations "with the 'dealer retail' condition of vehicles that have had their condition upgraded by the dealers seeking to sell them."  ECF 10-1 at 6.  Moreover, defendants contend: "The regulations that Plaintiffs' claims employ explicitly permit adjustments

21

based on a vehicle's condition in resolving total loss claims." ECF 10-1 at 7.  Therefore, although defendants agree with plaintiffs that they must pay the retail value of the loss vehicle, they posit that this value takes into account "the loss vehicle's condition."  *Id.* at 29.  And, defendants maintain that, without a claim that plaintiffs' "loss vehicles were in better condition than the condition set forth in their CCC Reports, Plaintiffs fail to plausibly allege they were underpaid." *Id.* at 22.

I must, of course, assume the truth of plaintiffs' factual allegations in the suit.  But, the facts are not actually disputed.  Rather, the dispute centers around the meaning of the respective state regulations, which is generally a question of law.

Specifically, the parties disagree on whether the "condition adjustment" found in the CCC Reports is permitted by the regulations, which use the term "retail value."  *See*, *e.g.*, ECF 1, ¶ 6 ("[Defendants] appl[y] an improper 'condition adjustment' deduction to the retail cost of these comparable vehicles to reduce from retail value to private party value, which violates Maryland and Illinois law and the insurance [policies], necessarily resulting in an underpayment when it pays ACV cash settlements."); ECF 10-1 at 6 ("CCC presents its opinion of what the loss vehicle would retail for in the loss vehicle's condition, which is consistent with Defendants' duty to pay the retail value of the loss vehicle in the loss vehicle's condition.").[5]

In turn, the dispute implicates principles of regulatory construction.  The parties do not provide case law or other guidance for how the Court should interpret state regulations.  Nor have

---

[5]  Plaintiffs assert in the Opposition that "GEICO can call the adjustment a 'condition adjustment' and conceive of the difference as entirely attributable to condition, but that does it [sic] make it factually true.  This argument therefore fails for this reason alone." ECF 25 at 15. Plaintiffs do not explain how the "condition adjustment" is not a condition adjustment.  In any event, they have not identified factual disputes or regulatory ambiguities.  The issue in the case concerns whether the "condition adjustment" is allowed under the state regulations.

the parties informed the Court as to whether any state agency has interpreted the regulations at issue.   In construing rules and regulations promulgated by a state administrative agency, the principles of statutory construction apply.  *Concerned Citizens of Coverly v. Montgomery Cnty. Plan. Bd.*, 254 Md. App. 575, 598, 274 A.3d 1144 (2022); *Mora v. Industrial Com'n*, 312 Ill. App. 3d 266, 271, 726 N.E.2d 650, 653, 244 Ill. Dec. 675, 678 (2000); *see also Goodman v Shulkin*, 870 F.3d 1383, 1386 (Fed. Cir. 2017) ("It is well established that '[t]he rules of statutory construction apply when interpreting an agency regulation."  (Citing *Roberto v. Dep't of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006)).[6]

Generally, "[w]hen faced with a statutory provision, 'the starting point for any issue of statutory interpretation . . . is the language of the statute itself.'"  *Redeemed Christian Church of God (Victory Temple) Bowie, Maryland v. Prince George's County, Maryland*, 17 F.4th 497, 508 (4th Cir. 2021) (quoting *D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016)) (alteration in original); *see Murphy v. Smith*, ___ U.S. ___, 138 S. Ct. 784, 787 (2018) ("As always, we start with the specific statutory language in dispute."); *Williams v. Carvajal*, ___ F.4th ___, 2023 WL 2669652, at *3 (4th Cir. March 29, 2023) ("As always, an issue of statutory interpretation begins with the

---

[6] In Maryland, "the expertise of the agency in its own field of endeavor is entitled to judicial respect."  *Finucan v. Md. Bd. of Physician Quality Assurance*, 380 Md. 577, 590, 846 A.2d 377 (2004).  An agency is granted further deference when it interprets a regulation it promulgated, rather than a statute enacted by the legislature.  *Md. Comm'n on Human Relations v. Bethlehem Steel Corp.*, 295 Md. 586, 593, 457 A.2d 1146 (1983).

In Illinois, "a reviewing court affords substantial deference to an agency's interpretation of a statute that the agency administers because of the experience and expertise the agency has gained through time by enforcing the statute."  *Zaccone v. Standard Life Ins. Co.*, JC-10-033, 2013 WL 1849515, at *10 (N.D. Ill. 2013) (citing *Crittenden v. Cook County Comm'n on Human Rights*, 990 N.E.2d 1161, 1167 (Ill. 2012).  And, in the federal context, in order for an agency's interpretation of a regulation to be entitled to deference, a reasonable agency interpretation must be the agency's "'authoritative'" or "'official'" position.  *Kisor v. Wilkie*, ___ U.S. ___, 139 S. Ct. 2400, 2416 (2019) (citation omitted).

text.") (citing *McAdams v. Robinson*, 26 F.4th 149, 156 (4th Cir. 2022)); *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 356 (4th Cir. 2020) ("'As in all statutory construction cases,' we start with the plain text of the provision.") (quoting *Marx v. General Revenue Corp.*, 568 U.S. 371, 376 (2013)); *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020) ("When interpreting a statute, courts must 'first and foremost strive to implement congressional intent by examining the plain language of the statute.'") (quoting *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010)); *see also United States v. Bryant*, 949 F.3d 168, 174-75 (4th Cir. 2020); *Ignacio v. United States*, 674 F.3d 252, 254 (4th Cir. 2012).

Notably, a statute "means what it says." *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016); *see United States v. Cohen*, ___ F.4th ___, 2023 WL 2564405, at *1 (4th Cir. Mar. 20, 2023). "'[A]bsent ambiguity or a clearly expressed legislative intent to the contrary,'" courts apply the "plain" meaning of the statute. *Abdelshafi*, 592 F.3d at 607 (quoting *United States v. Bell*, 5 F.3d 64, 68 (4th Cir.1993)). This is "determined by reference to its words' 'ordinary meaning at the time of the statute's enactment.'" *Abdelshafi*, 592 F.3d at 607 (quoting *United States v. Simmons*, 247 F.3d 118, 122 (4th Cir. 2001)). Moreover, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2126 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)).

Terms that are not defined are "'interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); accord *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020). Courts may also consider a statute's history and purpose to give effect to its language. *See Gundy*, 139 S. Ct. at 2126. However, courts may "not resort to legislative history to cloud a statutory text that is clear."

*Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *see Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("If the meaning of the text is plain . . . that meaning controls.").

The Fourth Circuit has instructed that, when interpreting a state statute, a federal court should "apply the statutory construction rules applied by the state's highest court." *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009); *see Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007). Both Maryland and Illinois follow general rules of statutory interpretation. *Johnson v. Mayor & City Council of Balt*., 430 Md. 368, 377, 61 A.3d 33, 38 (2013); *Hadley v. Ill. Dep't of Corrections*, 224 Ill.2d 365, 309 Ill. Dec. 296, 864 N.E.2d 162, 165 (2007).

In Maryland, the "'cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the General Assembly.'" *Conaway v. State*, 464 Md. 505, 523 212 A.3d 348, 358 (2017) (citation omitted); *see Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487 (2004). Courts first examine "'the plain meaning of the statutory language[.]'" *Johnson v. Mayor & City Counsil of Balt.*, 430 Md. 368, 377, 61 A.3d 33, 38 (citation omitted). If the language "'is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, [the] inquiry is at an end.'" *Id.* (citation omitted). However, if the statute's "'language is ambiguous or unclear, [courts] seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based.'" *Id.* (citation omitted).

The statutory language "'must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.'" *In re J.C.N.*, 460 Md. 371, 391, 190 A.3d 329, 341 (2018) (citation omitted). And, a court should strive to "avoid a construction of the statute that is unreasonable, illogical, or

inconsistent with common sense." *Bellard v.* State, 452 Md. 467, 481-82, 157 A.3d 272, 280-81 (2017).

Moreover, the statute must be read "'as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" *Conaway*, 464 Md. at 523, 212 A.3d at 358; *see Bourgeois v. Live Nation Ent's, Inc.*, 430 Md. 14, 27, 59 A.3d 509, 516 (2013). As the Maryland Court of Appeals[7] has explained, courts may "'neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute.'" *McCloud v. Dep't of State Police, Handgun Permit Review Bd.*, 426 Md. 473, 480, 44 A.3d 993, 997 (2012) (citation omitted).

Finally, dictionary definitions may provide a "'useful starting point'" to determine a term's meaning in common parlance. *Montgomery Cty. v. Deibler*, 423 Md. 54, 67, 21 A.3d 191, 198 (2011) (citation omitted); *see also Foy*, 461 Md. at 645, 197 A.3d at 11; *Bottini v. Dep't of Fin.*, 450 Md. 177, 195, 147 A.3d 371, 382 (2016) (using dictionary definition to construe the meaning of the term "money" in a statute). However, dictionary definitions are not necessarily dispositive. *Deibler*, 423 Md. at 67, 31 A.3d at 198. And, when a court turns to a dictionary to clarify a statutory term, the court should endeavor to consult an edition that was extant at the time that the

---

[7] In the general election held in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved changing the name of the State's intermediate appellate court, the Maryland Court of Special Appeals, to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland (Dec. 14, 2022), https://www.courts.state.md.us/media/news/2022/pr20221214#:~:text=Effective%20immediately %2C%20the%20Court%20of,the%20Appellate%20Court%20of%20Maryland.

To avoid confusion, I will refer to the names of the courts as they existed when the cited cases were decided.

challenged statute was enacted.  *Harvey v. Marshall*, 389 Md. 243, 260 n.11, 884 A.2d 1171, 1181 n.11 (2005).

Similar to Maryland law, the "fundamental rule" of Illinois statutory interpretation "is to ascertain and give effect to the legislature's intent."  *General Motors Corp. v. Pappas*, 242 Ill.2d 163, 351 Ill. Dec. 308, 950 N.E.2d 1136, 1146 (2011).  "[T]he most reliable indicator of legislative intent is the language of the statute," and that language is "given its plain and ordinary meaning."  *Roberts v. Alexandria Transp., Inc*., 183 N.E.3d 701, 706 (Ill. June 17, 2021).  And, where the "meaning of a statute is plain on its face, no resort to other tools of statutory construction is necessary."  *Id.*

Like Maryland, Illinois does not consider words and phrases in isolation, but rather interprets them "in light of other relevant provisions and the statute as a whole."  *County of Du Page v. Ill. Labor Relations Bd*., 231 Ill.2d 593, 326 Ill. Dec. 848, 900 N.E.2d 1095, 1101 (2008).  Courts may also "consider the purpose and necessity for the law, the evils sought to be remedied, and the goals to be achieved."  *Andrews v. Metro. Water Reclamation Dist*., 442 Ill. Dec. 715, 160 N.E.3d 895, 904 (2019).  And, when possible, courts should avoid interpreting a statute in a way that renders a word or phrase redundant, meaningless, or superfluous.  *People v. Trainor*, 196 Ill.2d 318, 256 Ill. Dec. 813, 752 N.E.2d 1055, 1063 (2001).  Finally, courts should presume that the Illinois General Assembly, "in enacting legislation, did not intend absurdity, inconvenience, or injustice."  *Roberts*, 183 N.E.3d at 706.

**2.**

As noted, when making a cash settlement in Maryland, COMAR 31.15.12.04A(1) provides that the insurer's minimum offer shall be "[t]he retail value for a substantially similar motor vehicle from a nationally recognized valuation manual or from a computerized data base that produces

statistically valid fair market values for a substantially similar vehicle as defined in Regulation .02B(7) of this regulation." However, COMAR 31.15.12.02B(7)(d) defines "substantially similar motor vehicle" as a motor vehicle that, compared to the loss vehicle, "[i]s in a condition substantially similar to or better than the condition of the damaged motor vehicle immediately before the damage occurred."

Plaintiffs claim that the "retail value" of a total loss vehicle must be calculated based on the retail value of the loss vehicle as though it were in dealer retail condition, regardless of the vehicle's actual condition, and without regard to COMAR 31.15.12.02B(7)(d). *See* ECF 25 at 18. However, defendants point to the text of the regulation and note that insurers may offer "[t]he retail value for **a substantially similar motor vehicle** . . . in a **condition substantially similar to** . . . the condition of the damaged motor vehicle immediately before the damage occurred." ECF 20-1 at 28 (emphasis in original) (citing COMAR 31.15.12). In the Court's view, the plain language of the regulation supports defendants' position.

Significantly, plaintiffs do not contest that adjustments in value may be made for differences in vehicle options and mileage. ECF 25 at 15 (noting that "making adjustments to account for differences in options and mileage is perfectly consistent with paying retail value, just as the [policies] and Maryland and Illinois law require"). Yet, plaintiffs fail to explain or reconcile the plain text in the regulations, which clearly permits adjustments to value based on condition, so that the loss vehicle is substantially similar to the comparable.

Downward adjustments are appropriate when the loss vehicle is in worse condition than the comparable vehicle. Conversely, an upward adjustment in value is appropriate when the loss vehicle is in better condition than the comparable vehicle. Indeed, if mileage and options adjustments are allowable, as plaintiffs recognize, other adjustments for pre-accident condition

would also be appropriate.  To conclude otherwise would remove the word "condition" from the valuation regulations, creating a windfall for those insureds whose vehicles are in poor condition and a loss for those insureds whose vehicles are in better than dealership retail condition.  That position is at odds with common sense.  *See Bellard*, 452 Md. at 481-82, 157 A.3d at 280-81.

Turning to the Illinois regulation, Ill. Admin. Code tit. 50 § 919.80(c)(2)(B)(i) specifies that the cash payment for a total loss vehicle claim may be based on electronically computerized sources that compute statistically valid retail values with "applicable allowances for mileage and condition."  And, as noted, Ill. Admin. Code tit. 50 § 919.80(d)(4) states that "[b]etterment deductions are allowable only if: The deductions reflect a measurable decrease in market value attributable to the poorer condition of, or prior damage to, the insured vehicle . . . ."

In interpreting the Illinois regulation, plaintiffs argue that the word "'allowances' generally has a positive or upward connotation—a cost-of-living 'allowance' or a child's monthly 'allowance'"— and not a negative connotation."  ECF 25 at 16.  On the other hand, defendants assert that "the plain meaning of 'allowances' in Ill. Admin. Code tit. 50, § 919.80(c)(2)(B) incorporates both upward and downward adjustments for the actual condition of the loss vehicle."  ECF 31 at 9.

As noted, plaintiffs acknowledge that a vehicle's mileage can affect the retail value.  They state, ECF 25 at 15: "The retail value of a vehicle with less mileage is higher than the retail value of an otherwise identical vehicle (and vice versa)."  Although plaintiffs acknowledge that a vehicle's mileage can result in an upward or downward "allowance" in calculating "retail value," they insist that condition "allowances" must be upward only.  *See id*. at 16.  In the Court's view, the use of the word "allowances" represents an insurer's duty to pay for the value of the loss vehicle in all respects, including condition.

Similarly, plaintiffs define 'betterment' as an improvement to property "that does more than restore to a former good condition."  ECF 25 at 15 (citing *Webster's Third New International Dictionary*, Unabridged 209 (1981)).  But, plaintiffs' interpretation says nothing of the word "deduction."  The provision actually allows for "Betterment deductions," so long as they "[r]eflect a measurable ***decrease*** in market value attributable to the poorer ***condition*** of, or prior damage to, the insured vehicle. . . ."  Ill. Admin. Code tit. 50 § 919.80(d)(4)(A)(i) (emphasis added).

Contrary to plaintiffs' assertions, the plain language of the regulations at issue allows for an insurer to adjust for the condition of the loss vehicle.  Had Illinois or Maryland intended otherwise, neither state would have permitted insurers to consider the condition of the loss vehicle when settling claims.  *See Azar v. Allina Health Servs.*, ___ U.S. ___, 139 S. Ct. 1804, 1813 (2019) ("So we're left with nothing but the doubtful proposition that Congress sought to accomplish in a 'surpassingly strange manner' what it could have accomplished in a much more straightforward way." (Citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 647 (2012)).

Consistent with Maryland and Illinois law, the CCC Reports recognize that the retail value of the loss vehicle depends necessarily on factors such as options, mileage, and condition. Defendants note that the CCC Reports calculate the "retail value" of the loss vehicle "in the precise conditions of the loss vehicle – what the market will bear for replacing the exact same vehicle in the exact same condition."  ECF 10-1 at 22.  The Ninth Circuit recently described this calculation in *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1136–37 (9th Cir. 2022):

> One adjustment in particular is at the core of this case. Used cars for sale at dealerships are usually in pretty good condition: the dealerships don't sell them otherwise, and CCC doesn't use dealerships that sell bad cars. To account for the difference between the average car owned by a private person and the cars for sale at dealerships, CCC thus reduces the totaled car's valuation. But CCC also looks at the actual pre-accident condition of the totaled car. If it was in great condition, then CCC reverses the negative adjustment and sometimes even applies a positive adjustment.

Furthermore, "[t]here is no evidence that any state regulator or court has ever found CCC's evaluations to be improper, illegal, unethical, unfair, or otherwise inappropriate." *Fortson v. Garrison Property and Casualty Insurance Company*, CCE-19-294, 2022 WL 198782, at *6 (M.D.N.C. Jan. 13, 2022). Indeed, plaintiffs do not argue otherwise. They assert, ECF 25 at 10 n. 5: "Plaintiffs have no problem with CCC as a source, and indeed believe CCC accurately determines the retail value of insured vehicles."

As noted, "CCC has four 'condition values'": "Exceptional," "Dealer Retail," "Average Private," and "Rough." ECF 1-3 at 7-8; ECF 1-4 at 7-8; ECF 1-5 at 9-10; *see also* ECF 1, ¶ 58. However, these values are just labels or descriptors. Clearly, the CCC Reports' use of the phrases "Dealer Retail" and "Average Private" are referring to levels of condition of various components of the loss vehicle for which the laws of Maryland and Illinois permit adjustment. *See* ECF 1-3 at 7-8 (describing condition of key components of Curtis's vehicle as "Average Private" or "Rough"); ECF 1-4 at 7-8 (describing key components of Yearman's vehicle as "Dealer Retail" or "Average Private"); ECF 1-5 at 9-10 (describing key components of Harris's vehicle as "Dealer Retail" or "Average Private"). With these condition adjustments, defendants are able to estimate the retail value of the loss vehicles, notwithstanding that they are not in the same condition as the comparable vehicles.

Defendants explain that, in order "[t]o permit an apples-to-apples comparison between comparable vehicles and the loss vehicle, CCC applies a condition adjustment to the comparable vehicles so each comparable vehicle is in Average Private condition." ECF 10-1 at 12; *see also* ECF 31 at 4 ("Because the vast majority of vehicles being driven on the road are closer to the condition of the average vehicle on the road than they are to vehicles for sale at dealerships, it makes much more sense to use the average condition of a vehicle being driven on the road as a

starting point."). And, as plaintiffs acknowledge, the condition adjustment is eliminated if the conditions of the loss vehicle's nine key components match the condition of the comparable vehicles. ECF 1 at 14 n. 4. Accordingly, the CCC Reports are consistent with defendants' duty under the regulations to pay the retail value of the loss vehicle. But, retail value is affected by the condition of a vehicle. And, if the condition of the loss vehicle is better than the condition of the comparable, the Insurers add the value. Conversely, the Insurers make deductions when the condition of the loss vehicle warrants deductions.

For example, as explained in the Yearman CCC Report, "CCC ma[d]e [] dollar adjustments that reflect the impact the reported condition [of Yearman's loss vehicle] has on the value of the loss vehicle as compared to Average Private condition." ECF 1-4 at 7. For Yearman's loss vehicle, the body, seats, carpets, dashboard, and headliner were in "Dealer Retail" condition. *Id*. at 7-8. Consequently, CCC applied an upward adjustment for each of these components. *Id*. However, there was no adjustment for the remaining components (mechanical, tires, paint, and glass) because these were in "Average Private" condition. *Id*. And, there were no downward adjustments because no components were in worse than "Average Private" condition. In sum, an upward adjustment of $672 more than the "Average Private" condition was applied to the Base Vehicle Value, resulting in an Adjusted Vehicle Value of $11,842. *Id*. at 2.

According to the Curtis CCC Report, the tires of his loss vehicle were in "Rough" condition. ECF 1-3 at 7. Therefore, CCC applied a downward adjustment of $88 for this component. *Id*. But, there were no adjustments made for the remaining eight components because CCC found them to be in "Average Private" condition. ECF 1-3 at 7-8. And, using the same process, CCC found Harris's seats, carpets, dashboard, and headliner to be in "Dealer Retail" condition. ECF 1-5 at 9-10. Accordingly, CCC applied an upward adjustment for each of these

components.  *Id*.  There was no adjustment for the remaining components (body, mechanical, tires, paint, and glass) because these features were in "Average Private" condition.  *Id*.  Additionally, no downward adjustments were made because no components were in worse than "Average Private" condition.  *Id*.  Consequently, CCC increased the value of Harris's loss vehicle by $258.  *Id*. at 10.

The Fifth Circuit's decision in *Singleton v. Elephant Insurance Co*., 953 F.3d 334 (5th Cir. 2020) (per curiam), is informative.[8]  There, the plaintiffs, who were insureds, filed a putative class action against their insurer, asserting claims for breach of their insurance policies.  The insureds' vehicles were loss vehicles, for which they sought compensation from the insurer.  Their insurance policies provided for payment of ACV, and stated that the "actual cash value is determined by the market value, age and condition of the auto . . . at the time the loss occurs."  *Id.* at 336.  But, the insureds also sought reimbursement for the taxes and fees associated with replacing their "totaled vehicles, thus making them whole."  *Id.*  Instead, the insurer compensated the insureds for the "'adjusted vehicle value' of their automobiles before the accidents," minus their deductibles, and without payment of taxes and fees.  *Id.*

The district court ruled that the insureds were not entitled to recovery of those costs and dismissed the case for failure to state a claim.  The Fifth Circuit affirmed.

The Fifth Circuit observed that "[t]he adjusted vehicle value was calculated based on the sale prices of comparable vehicles, with adjustments made for the pre-accident condition of [the insureds'] vehicles," and the insureds did not "dispute the accuracy of these calculations."  *Id*. at 336 n.1.  The insureds also did not dispute that ACV is equivalent to "fair market value."  *Id.* at 337.  And, said the court, that definition "plainly excludes taxes and fees that are remitted to the State."  *Id.* at 338.

---

[8] The parties have not discussed *Singleton*.

But, the insureds argued "that dismissal of their case at the pleading stage was inappropriate because the market value of a vehicle is a question of fact." *Id*. at 339.  However, the Fifth Circuit concluded that the argument "lack[ed] merit" and said, *id*.: "Although the market value of a particular automobile is certainly a factual question, the complaint does not allege that [the insurer] inaccurately appraised [the insureds'] vehicle.  Rather, the basis of the complaint is that [the insurer] does not compensate its policyholders for the taxes and fees involved in replacing their vehicles."  In the view of the Fifth Circuit, this issue was a matter of law.  *Id*.

Similarly, plaintiffs here do not allege that the conditions of their respective loss vehicles were better than described in the CCC Reports.  And, as noted, plaintiffs agree that "CCC is a perfectly fine source of identifying retail value."  ECF 25 at 10 n. 5.  Instead, plaintiffs assert that, even if each of the nine components of the loss vehicles were indisputably in "Rough" condition, the insureds must be paid as though each component were in "Dealer Retail" condition.  See ECF 1 at 14 n.4.  In other words, plaintiffs demand that defendants pay for their loss vehicles as though they were in the condition of a vehicle at a dealership, regardless of the loss vehicle's actual condition.

The issue is one of law, not fact.  And, plaintiffs' position is unsupported by the plain language of the regulations, which expressly allow for adjustments based on a vehicle's condition, options, and mileage.  Had the insurers been required to equate the value of a loss vehicle with the value of the loss vehicle in dealership retail condition, the regulations would have said so; they would not have allowed for adjustments based on vehicle conditions.

In sum, the crux of plaintiffs' argument is that adjustments based on a vehicle's package, make, model, trim, options, and mileage are appropriate, but adjustments based on the vehicle's condition are inappropriate because the Maryland and Illinois regulations use the term "retail

value." But, the Maryland and Illinois regulations explicitly allow adjustments to be made to value based on the loss vehicle's actual condition. Indeed, both Maryland and Illinois recognize that "retail value" refers to the retail value of the loss vehicle when all relevant factors are considered. COMAR 31.15.12.02(B)(7); Ill. Admin. Code tit. 50 § 919.80(c)(2).

Plaintiffs' position would lead to "anomalous results." *Cf. Yashenko*, 446 F.3d at 548. Some insureds would obtain payments in excess of the retail value of the loss vehicles, while others would receive payments less than the retail value. Such an outcome is at odds with the plain language of the regulations. Therefore, plaintiffs fail to state a claim for breach of contract or violation of Maryland and Illinois law.

### III. Motion to Sever and Motion to Stay

Along with its Motion to Dismiss, "[d]efendants request that – while all claims remain in the United States District Court for the District of Maryland and before the Honorable Ellen L. Hollander – Maryland Plaintiff and the Illinois Plaintiffs' claims be severed." ECF 11-1 at 2.

Federal Rule of Civil Procedure 21 provides that a court may "sever any claim against a party." Notably, a district court has broad discretion in deciding whether to grant severance. *CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*, 896 F. Supp. 505, 506 (D. Md. 1995) (citing *United States v. O'Neill*, 709 F.2d 361, 369 (5th Cir. 1983)).

There is "a presumption in favor of the nonmoving party that all claims in a case will be resolved in a single trial and not be severed, placing the burden on the party moving for severance to show that (1) it will be severely prejudiced without a separate trial; and (2) the issue to be severed is so distinct and separable from the others that a trial of that issue alone may proceed without injustice." *Equal Rights Center v. Equity Residential*, 483 F. Supp. 2d 482, 489 (D. Md. 2007) (internal quotations omitted). More broadly, "[c]laims may be severed if doing so 'will

serve the ends of justice and further the prompt and efficient disposition of litigation.'"

*Chakrabarti v. United States Citizenship & Immigr. Servs.*, No. PJM-21-1945, 2021 WL 4458899, at *6 (D. Md. Sept. 29, 2021) (quoting *CVI/Beta Ventures*, 896 F. Supp. at 506).

In their Motion to Sever, defendants state that if the Motion to Dismiss is granted, "then the Court need not consider the relief sought in this Motion."  ECF 11-1 at 1.  Because I am granting the Motion to Dismiss, I shall deny the Motion to Sever, as moot.

In view of the disposition of the Motion to Dismiss, it is also unnecessary to resolve defendants' Motion to Stay.  ECF 33.  Therefore, I shall deny the Motion to Stay, as moot.

## IV.  Conclusion

For the reasons stated above, I shall grant the Motion to Dismiss.  Further, I will deny the Motion to Sever and the Motion to Compel, as moot.

An Order follows, consistent with this Memorandum Opinion.

Date:  March 29, 2023                                    _____/s/_____

                                                        Ellen L. Hollander
                                                        United States District Judge